[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a petition for a writ of habeas corpus by the petitioner, now incarcerated at the Niantic Correctional Institute, serving a sentence of 20 years after conviction on the charge of conspiracy to commit assault in the first degree in violation of General Statutes § 53a-48 (a) and § 53a-59
(a)1. Petitioner claims that her imprisonment is illegal in that she was provided with ineffective assistance of counsel at all stages of her criminal prosecution resulting in her being forced to change her plea of not guilty to guilty.
For reasons hereinafter stated, the petition is denied.
The basis facts underlying the crime for which the petitioner was convicted are not greatly in dispute.
Petitioner had been married for some time to Kevin Henry. Although the petitioner and her husband had two children and she was then pregnant, the marriage could only be characterized as tumultuous with numerous incidents of spousal abuse by the husband. On March 17, 1993, the petitioner telephoned her husband concerning a need for child support. Kevin was then at the apartment of his new girlfriend, Lori Englehardt, who became involved in the conversation. Petitioner heard Ms. Englehardt, in the background, call her a "slut." The telephone conversation was then terminated by the petitioner who called again informing Kevin that she was "coming up there."
Petitioner was angry and proceeded to call the beeper number of a friend who was a member of the Los Solidos gang. She then took a shower. While the petitioner was so engaged, a caller responded to the beeper message. The call was taken by the petitioner's mother, Lunilda Martinez, who made arrangements and informed the petitioner that they were to pick up the Los Solidos members at an address in Waterbury.
With Lunilda driving, they proceeded to pick up four Los Solidos ladies and proceeded to Ms. Englehardt's residence. The conversation between the petitioner and the others while in transit is in dispute and is not part of the record of this case. The petitioner did inform them about Ms. Englehardt calling her a "slut" and the girls knew how "pissed and hurt" she was. Two of the Los Solidos were armed with what could be found to be deadly weapons or dangerous instruments, a knife and a pool cue.[1]
Petitioner's written statement indicates that she observed that one of the young ladies was armed with a club. CT Page 274
Upon reaching Ms. Englehardt's residence, they went to the door. The petitioner knocked on the door, and after a short while, Ms. Englehardt opened the door and invited petitioner in. The petitioner declined to enter and requested Ms. Englehardt to come out into neutral territory. An argument then developed between the two. The four Los Solidos ladies then gave Ms. Englehardt a "bum rush" and entered the apartment while the petitioner rejoined her mother in the car.
Ms. Englehardt was then assaulted by the Los Solidos. She suffered seven bruises, eight stab wounds to her neck, abdomen and leg, resulting in her death.
After the assault, the four women returned to the car where it was agreed that they would drive petitioner to St. Mary's Hospital where she could establish an alibi based upon a claim that she was in labor. This was done. Although the alibi could not be established, she delivered a child the next day.
Subsequently, the petitioner was arrested for the crimes of conspiracy to commit murder in violation of General Statutes § 53a-48 and § 53a-54a(a), for which a sentence of 20 years could be imposed, and aiding and abetting the crime of murder in violation of § 53a-8 (a) and § 53a-54a(a), for which a sentence of not less than 25 and not more than 60 years could be imposed. If convicted of both crimes, the petitioner would be exposed to a sentence of not less than 25 years and a maximum of 80 years.
On March 29, 1993, Attorney Richard M. Marano was appointed as a special public defender to represent the petitioner in the criminal prosecution. At the time, Attorney Marano was under contract with the public defender's office to provide criminal defense services in the Judicial District and Geographical Area courts in Waterbury.
Attorney Marano represented petitioner at a hearing of probable cause held under the provisions of General Statutes § 54-46a. He continued to represent the petitioner during the pretrial phase and during jury selection. Part way through the jury selection, on Attorney Marano's advice, the petitioner entered a plea of guilty under the terms of Alford v. NorthCarolina, to a reduced charge of conspiracy to commit assault in the first degree in violation of General Statutes § 53a-48
CT Page 275 (a) and § 53a-59 (a)1. The plea exposed petitioner to a sentence of not less than five years and not more than 20 years incarceration. She had a right to argue for a sentence less than the maximum.
Petitioner was represented by Attorney Marano at the sentencing hearing where she received a sentence of 20 years.
In her petition, it is claimed that petitioner's imprisonment is illegal in that Attorney Marano provided ineffective assistance of counsel at all stages of her criminal prosecution which resulted in the petitioner being forced to change her plea to guilty.
The law with respect to petition for writs of habeas corpus on a claim of ineffective assistance of counsel is fairly settled.
A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674, reh. denied 467 U.S. 1267,104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). This right arises under thesixth and fourteenth amendments to the United States Constitution and article first § 8 of the Connecticut Constitution. Baezv. Commissioner of Corrections, 34 Conn. App. 236, 242-43, cert. denied, 231 Conn. 905 (1994). Pretrial negotiations implicating the decision of whether to plead guilty is a critical stage in criminal proceedings; Colson v. Smith, 438 F.2d 1075, 1078 (5th Cir. 1971); and plea bargaining is an integral component of the criminal justice system and essential to the expeditious and fair administration of our courts. Blackledge v. Allison,431 U.S. 63, 71, 97 S.Ct. 1621 52 L.Ed.2d 136 (1977)." Copas v.Commissioner of Corrections, 234 Conn. 139, 153 (1995).
In Strickland v. Washington, supra, the United States Supreme Court articulated the standard for determining whether a petitioner has been deprived of his, or her, constitutional right to effective assistance of counsel. Under Strickland, the petitioner must establish by a preponderance of the evidence that: (1) defense counsel's performance was not reasonably competent or within the range of competence expected of attorneys with ordinary training and skill in criminal law; and (2) but for counsel's substandard performance, there is a reasonable probability that the result of the proceeding would have been CT Page 276 different. Levine v. Manson, 195 Conn. 636, 640 (1985). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Chairamonte v. Manson,6 Conn. App. 476, 481 (1986). Connecticut has adopted the Strickland
standard.
In Hill v. Lockhart, 474 U.S. 52, 57-58, 106 S.Ct. 366, 370,88 L.Ed.2d 203 (1985), the United States Supreme Court analyzed the second prong of Strickland in relation to a case in which, as here, the petitioner entered a plea of guilty. Hill required the petitioner to demonstrate that he would not have pleaded guilty, and but for the ineffective assistance of counsel he would have insisted on going to trial, and that the evidence that had been undiscovered or the defenses he claims should have been introduced were likely to have been successful at trial. Copasv. Commissioner of Corrections, supra, 234 Conn. 151.
"(A) court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland v.Washington, supra, 466 U.S. 690.
At the time he represented petitioner, Attorney Marano was a member of the state and Waterbury bar associations and a member of various professional associations. He had been vice president of the Connecticut Criminal Defense Lawyers Association and was the editor of Counsel for the Defense. He was also a life member of the National Association of Criminal Defense Lawyers. He had also testified as an expert in ineffective assistance of counsel litigation.
Upon completion of his education and admission to the bar, CT Page 277 Attorney Marano became an associate in a Waterbury law firm. This firm did a considerable amount of criminal business and he devoted much of his time to criminal work. After leaving the firm, he formed a partnership with another lawyer for the general practice of law. Sixty percent of his practice was devoted to representing persons accused of crimes. At the time he represented the petitioner, he was under contract with the public defender's office to represent a specific number of criminal defendants for an agreed fee. This contract arrangement had existed for a number of years.
He represented people in both Parts A and B of the Superior Court. A majority of his cases were in Part A where he had represented hundreds of clients. In some of those cases, the services of an investigator had been utilized.
The attorney had tried approximately 16 criminal cases to conclusion. Although he had represented persons charged with murder, he had not tried any murder cases.
In the petition now before this Court it is claimed that Attorney Marano's acts and omissions in representing the petitioner fell below the level of reasonable competency required of criminal defense attorneys in this state in a number of specific ways.
In the petition, it is claimed that the attorney failed to conduct any investigation into the circumstances of the crime personally or through an investigator, but relied solely on information provided him by the prosecuting officials. Associated with this allegation is a claim that the attorney failed to interview, or obtain statements from, the co-defendants which would have proven exculpatory in nature.
At the time he represented the petitioner, the state had an open file policy and Attorney Marano was able to review the reports of the investigation which the prosecution had conducted into the death of Ms. Englehardt. From this review, he concluded that the only people who could shed light on the homicide were the six eyewitnesses. These were petitioner and her co-defendants. All six, including petitioner and her mother, had given written statements to the police. The attorney had copies of all such statements. From his assessment of the situation, he determined that there was nothing further to investigate and that any further investigation would be fruitless. Therefore, no CT Page 278 further investigation was undertaken.
Criminal intent was an important element which the state would have to prove in the prosecution of both charges against the petitioner. The state could only prove this criminal intent by circumstantial evidence. The testimony and statements of the participants would be important components of the State's case against the petitioner on this issue. What the other five participants might say if called by the State to testify concerning what petitioner did at the scene of the homicide or during the drive to the scene could be used to prove criminal intent. What these people would say in their testimony was then important to the defense of petitioner's case on the issue of intent. This testimony might also be important with respect to possible defenses of renunciation and passive acquiescence.
The petitioner and her father urged Attorney Marano to interview the co-defendants claiming that they had altered their stories so as to exculpate petitioner. The attorney discussed this with counsel for the co-defendants. They refused to allow any such questioning of the clients. Under such circumstances, it was not possible for Attorney Marano to question these potential witnesses because of the Rules of Professional Conduct § 4.2.
None of the co-defendants' statements were placed in evidence in these proceedings but it must be concluded that at least some of the statements were inculpatory to petitioner and at least one of the attorneys indicated that his client was hostile to petitioner who his client blamed for instigating the crime.
Attorney Marano had copies of the statement and could have used any inconsistencies to cross examine any co-defendant who might appear as a witness against his client but he could not ethically obtain new statements.
The petitioner and her father reported to the attorney that they had heard that some of the co-defendants had changed their version of how the crime occurred from that set forth in their statements. It was reported that they had discussed this with other prisoners. Attorney Marano was urged to interview these other prisoners. He did not do so or request that it be done. He felt that any such testimony would be hearsay and that even if the co-defendants deviated from their written statements at trial, the statements would probably be admitted for substantive CT Page 279 purposes under the rule of State v. Whelan, 200 Conn. 743 (1986), cert. denied 479 U.S. 994, 107 S.Ct 597, 93 L.Ed.2d 598 (1986). It must be noted, however, that the inconsistent statements might be used at trial to attack the credibility of witnesses where applicable.
Attorney Marano was also urged to question members of the Henry family. He did not do this because he felt that the eyewitnesses were more important and he wished to concentrate on their testimony.
At the time he represented petitioner, Attorney Marano was a lawyer with considerable training and experience in criminal law. Was his performance in not pressing the investigation and not questioning the witnesses as alleged within the range of competency required under the first prong of Strickland v.Washington, supra, 466 U.S. 687?
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered.Strickland v. Washington, supra, 466 U.S. 690 (citation omitted, internal quotation marks omitted).
The attorney's failure to conduct an independent investigation into the facts and circumstances of the crime cannot be found to be unreasonable under the circumstances existing at the time. There was nothing to indicate that any such inquiry would produce anything of importance and that evidence of the crime could only come from the eyewitnesses. "[T]he test should be whether an adequate investigation would have enabled counsel to cast reasonable doubt on the government's evidence." Siemon v. Stoughton, 184 Conn. 547, 557 (1981). CT Page 280 There has been no showing that such an investigation would have produced such anything exculpatory. Any conclusion to the contrary would have to be based upon speculation and unsubstantiated hope.
The situation here is quite different to that in Siemon v.Stoughton, supra, where counsel had reliable evidence that the crime could have been committed by another and a reliable party suggested further investigation.
With respect to the claim that the attorney failed to interview witnesses recommended by petitioner and her father, it has been noted that he had been precluded from contact with the co-defendants by their attorneys and the Rules of Professional Conduct.
Attorney Marano probably could have interviewed the prisoners to whom it was claimed the co-defendants talked. Questions of credibility aside, it is doubtful if such interviews would have been productive. What the prisoners would say has not been established. Although it is speculation, their testimony may have been about admissions which would have supported a different version of the crime. According to this version after the initial verbal confrontation where petitioner had left the scene and was sitting in the automobile with her mother, Ms. Englehardt uttered an ethnic slur which then provoked an unplanned homicide.
In this connection, petitioner's mother and co-defendant, who was sitting with her in the car at the time Mrs. Englehardt was killed, was convicted after trial. At least one of the co-defendants testified in that trial and there is nothing to indicate that any inconsistent statements or exculpatory theories played an effective part in that trial.
There is nothing to indicate that the attorney's failure to interview members of the Henry family was unreasonable.
 II
The complaint alleges that Attorney Marano's performance was deficient in that he failed to have petitioner examined under the provisions of General Statutes § 54-56d and that he failed to have competent medical authority review petitioner's psychological and psychiatric records. CT Page 281
General Statutes § 54-56d deals with the mental competency of criminal defendants. The statute provides that "(a) defendant shall not be tried, convicted or sentenced while he is not competent." The statute also provides that a defendant is not competent if he is unable to understand the proceeding against him or to assist in his own defense. State v. DeAngelis,200 Conn. 224, 229 (1986).
In State v. Wolf, 237 Conn. 633, 663 (1996), our Supreme Court, relying on Dusky v. United States, 362 U.S. 402,80 S.Ct. 788, 4 L.Ed.2d 824 (1960), elaborated on the criteria for determining competency. In Wolf, the court stated the issue as "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of proceedings against him." Id.
The statute also sets forth the mechanics for requesting a judicial determination of competency. Factors which might indicate a lack of competency and a need for proceeding under the statute include: a history of mental illness; irrational behavior during the course of representation; rude and argumentative conduct; and commission of a bizarre crime. State v. Wolf, supra.
Under the statute, every defendant is presumed to be competent, and there was nothing to indicate that any of the above criteria were exhibited by petitioner during the time that she was represented by Attorney Marano. She did have some mental health problems, but there was no history of any diagnosed mental disease which might affect her competency.
It clearly has not been established that Attorney Marano's conduct in not proceeding under General Statutes § 54-56d was below the level of reasonable competence required of him.
It is also alleged in the complaint that Attorney Marano was deficient in that he failed to have the petitioner's psychological and psychiatric records examined by a competent medical authority. It is claimed that such an examination may have provided a defense which could be used at trial.
An accused person's mental state at the time of the commission of a crime could be a vital factor in a defense to criminal charges. Extreme emotional disturbance could be a defense under General Statutes § 53-54a(b). Proof that a CT Page 282 defendant was suffering from a mental disease or defect could also be important. Evidence of a defendant's mental state might also bear on the issue of criminal intent.
Prior to petitioner's plea of guilty, Attorney Marano made no concerted effort to obtain petitioner's medical records. He was aware that the petitioner had some psychiatric history and that she had been the victim of spousal abuse. Petitioner, however, was reluctant to discuss or inform the attorney in any detail of these problems. The attorney knew that she was near the end of her pregnancy at the time of the murder, was admitted to the hospital the same day and delivered a child not long after. There was evidence that the attorney discussed the effect which this might have had on petitioner's mental situation with Dr. William Harkins.
After petitioner entered a plea of guilty, Attorney Marano did obtain petitioner's medical records and a letter from Dr. Harkins to be used in mitigation.
The record indicates that petitioner had made suicide attempts, had been subject to mental abuse by her husband, and had been involved in treatment and counseling. There is nothing to indicate, however, that petitioner suffered from any serious mental condition, and although Dr. Harkins' report indicated that petitioner's condition might have affected her judgment at the time of the crime, his testimony in court was not supportive of any hypothesis which could be used at trial.
It was suggested in this proceeding that if the information concerning petitioner's mental health had been presented to a defense-oriented forensic psychiatrist a defense might have been forthcoming. This is doubtful, however, and at best pure speculation.
Considering all of the evidence, it cannot be found that Attorney Marano's performance was defective in not pursuing a psychiatric defense. There was little to indicate to him that it would be productive. His client was reluctant to discuss these matters. An important consideration was also that the petitioner claimed she was not guilty and did not commit the crime. The attorney was concentrating on this aspect of the case.
The attorney did attempt to use all of the information bearing on petitioner's mental health at the time of sentencing CT Page 283 with the reasonable hope that it would be considered in mitigation and would produce a lesser sentence.
 III
The complaint alleges that Attorney Marano misled and misinformed the petitioner with regards to the nature and progress of the proceedings against her, thereby seeking to induce her to change her plea.
On this issue, the evidence indicated that petitioner did not make bond and was incarcerated pending trial. While she was incarcerated, Attorney Marano met with petitioner to discuss her case in an interview cell at the courthouse on a number of occasions. After changing her plea, he met with her at the prison on one occasion.
It is important to note the status of the proceedings at the time the case was called for trial. Petitioner was then charged with aiding in the murder of Ms. Englehardt and conspiracy. If convicted of both charges, she was exposed to an 80 year sentence. On the aiding charge there was a minimum sentence of 25 years. At pretrial a sentence of 35 years had been indicated.
Attorney Marano was concerned about the trial. He knew that the alibi defense would be "blown out of the water." The attempted fabrication of the alibi might also be used to show a consciousness of guilt. Attorney Marano feared that one, or more, of the co-defendants would reach agreement with the state and testify against the petitioner. He felt that this testimony, together with the petitioner's statement, would result in a conviction, but not necessarily of all of the specific crimes charged. The attorney was also concerned about what effect the gruesome color photographs of Ms. Englehardt's body might have at trial.
He communicated these concerns to the petitioner and her father upon whom she relied for counsel. Petitioner remained adamant in her position that she was not guilty and wanted to go to trial. Attorney Marano testified that her position was based upon a belief that since she was not present at the time of the killing she could not be guilty.
At the time the case was called for trial, there were still ongoing discussions between counsel concerning settlement. When CT Page 284 the trial judge learned of this, he set a deadline after which plea negotiations should cease.
Attorney Marano discussed this situation with the petitioner and presented what would probably be the last offer to settle the case prior to trial. The proposal called for a plea of guilty to a reduced charge of conspiracy to commit assault in the first degree in violation of General Statutes § 53a-48 (a) and § 53a-59a(1). There was no agreement on the sentence to be imposed, but the petitioner was exposed to a sentence of not less than five and not more than 20 years with petitioner free to argue for a sentence less than the maximum.
At the time, the parties were aware that one of the co-defendants had pleaded guilty in return for a 40 year sentence.
The attorney discussed this settlement with petitioner. He urged her to accept it, and after some discussion she agreed. Subsequently, petitioner entered an Alford plea of guilty to the reduced charge. After a canvass, the plea was accepted and a date set for the imposition of sentence.
Petitioner now claims that she was induced to change her plea to guilty by misinformation from her lawyer. The allegation in the complaint that Attorney Marano misled and misinformed her family members is tied into this claim.
There is no professional requirement that an attorney keep an accused person's family members apprised of the progress of a criminal case. Attorney Marano, however, had a number of discussions with petitioner's father, Javier Martinez, and he had been counseling his daughter. These conferences with the attorney were not always amicable. Mr. Martinez continually expressed confidence in the innocence of his wife and daughter and urged Attorney Marano to interview the co-defendants and others. The attorney, on the other hand, tried without success to impress Mr. Martinez with the strength of the State's case and the advisability of a resolution short of trial.
Petitioner testified that Attorney Marano pressured her into accepting the plea agreement. She stated that prior to agreeing to the change of plea, she asked the attorney to discuss the plea agreement with her father. She stated that he did so and reported back that her father was 100 percent behind her and that if she wanted to plead guilty it was okay with him. She then CT Page 285 agreed to change her plea.
Mr. Martinez testified that at no time did he assent to his daughter changing her plea.
The claim is that the attorney misled petitioner into thinking that her father was in agreement with her entering a plea of guilty to the reduced charge and that this induced her to change her plea. The credible evidence, however, does not support this claim and it cannot be found to have been proven. There is a natural tendency for persons in stressful situations to select from advice given those words which are supportive of their preconceptions. As time passes, a selective memory then reinforces a version of events which is less than accurate.
Other factors mitigate against the claim petitioner was misled by her attorney.
At the time petitioner entered her plea of guilty she was canvassed by a judge. Although the transcript of the proceeding was not in evidence, it must be assumed that it was adequate and in accordance with Connecticut Practice Book § 711 to § 713. Section 712 prohibits the judicial authority from accepting a guilty plea without first determining from the defendant that the plea is voluntary and not the result of force or threats or other promises. State v. Carter, 243 Conn. 392, 397 (1997). It must be assumed that this procedure was followed here and a finding of voluntariness made. This finding could not have been made if petitioner indicated that she had been misled or pressured into entering her plea.
The probation officer who interviewed petitioner after the plea notified Attorney Marano that petitioner indicated that she had been intimidated by her lawyer. She did not say that she had been misled by him. Attorney Marano visited petitioner at the prison to discuss this claim of intimidation, and she agreed that it was not true.
At the time of sentencing, petitioner addressed the Court accepting responsibility for the homicide, but denying criminal intent. Although, having the opportunity to do so, she made no attempt to complain about her lawyer or imply that she had been misled into entering her plea. It is noted that the sentencing took place weeks after the plea and it is logical to conclude that petitioner had discussed with her father the circumstances CT Page 286 surrounding the change of plea.
The record fails to show that petitioner made any attempt at any time to withdraw her plea or to complain about being misled by her attorney. The record indicates that petitioner was not the type of person who would suffer in silence being lied to by her attorney in an important matter such as claimed here. Yet, she made no complaint at any time.
Petitioner's father, Javier Martinez, had personal knowledge about criminal procedure and how things worked in the court system. At one time, he had served as a court interpreter. He also had two felony convictions and had served time in prison. He was personally acquainted with the public defender, the person who had appointed Attorney Marano to represent his daughter. Yet he made no complaint about the quality of representation his daughter was receiving or that the attorney had misled his daughter into changing her plea either to the public defender or a judge.
For someone with Mr. Martinez's background and experience to say that he did not know he could raise questions of misrepresentations is not worthy of belief.
It cannot be found then that Attorney Marano misled or misinformed either petitioner or members of her family as alleged in the complaint.
 IV
The complaint further alleged that Attorney Marano failed to allow petitioner to review her presentence report rendering her unable to respond to inaccuracies and errors in the report which created an unfavorable influence on the sentencing judge.
While it is true that petitioner did not read the presentence report, the import that this involved substandard or unprofessional conduct on the part of the attorney have not been proven. Prior to sentencing, Attorney Marano read the presentence report to the petitioner and discussed it with her. She expressed concern about some of the things in the report and errors were noted. At the sentencing hearing, the attorney pointed out a factual error in the report and commented on matters in the report with which petitioner was concerned. In her remarks to the Court, petitioner did not mention the CT Page 287 presentence report.
It has not been proven that the procedure used by Attorney Marano in reviewing the presentence report with petitioner and in his representing of her at the sentencing hearing fell below the level of competence required of him.
 V
Considering all of the allegations of the complaint and the evidence presented in support of such allegations, it must be concluded that petitioner has failed to prove that Attorney Marano was less than reasonably competent in representing her or that his performance was not within the range of competence expected of attorneys with ordinary training and skill in criminal law.
The above conclusions are dispositive of the case and it is therefore unnecessary to explore the second prong of Stricklandv. Washington, supra, 466 U.S. 687, as applied in cases such as here where the petitioner has entered a plea of guilty. In such cases, if the attorney's performance has been found to be below the range of competency expected, the Court would have to determine whether, except for the ineffective assistance, the petitioner would have insisted on trial and that evidence that had been undiscovered or the defenses he claims should have been introduced would likely be successful at trial. Hill v.Lockhart, supra, 474 U.S. 52; Copas v. Commissioner ofCorrections, supra, 234 Conn. 153.
In the case at bar, there is little evidence to demonstrate that if petitioner had insisted on continuing with the trial and the case went to verdict, such verdict would have been favorable. Such a determination would have to be based on speculation which the Court cannot do.
Accordingly, the allegations of the complaint not having been proven, the petition is denied.
Joseph J. Purtill Judge Trial Referee