******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* EMMANUEL C.*
## (AC 47220)

Cradle, Clark and Prescott, Js.**

*Syllabus*

Convicted, following a jury trial, of risk of injury to a child, the defendant appealed. He claimed, inter alia, that there was insufficient evidence to support his conviction. *Held*:

The evidence was sufficient to support the defendant's conviction because the jury reasonably could have found, on the basis of the evidence presented and the inferences reasonably drawn therefrom, that the defendant engaged in an act of deliberate, blatant abuse that was likely to endanger the victim's physical well-being.

This court dismissed as moot the defendant's claim that the trial court erred in denying his motions for a bill of particulars, as the defendant's motions pertained solely to a count of the operative information on which the defendant had been acquitted.

This court affirmed the trial court's denial of the defendant's motion for a mistrial on the alternative ground that the defendant failed to establish that certain impeachment evidence was suppressed by the prosecutor in violation of *Brady* v. *Maryland* (373 U.S. 83), as the defendant failed to point to persuasive evidence that demonstrated that the prosecutor had prior knowledge of how the victim would testify and, even if this court assumed that the prosecutor knew prior to trial that the victim's testimony would differ from his previous statements to the police and to others, that information was elicited during the direct examination of the victim and, on the basis of the record, this court could not conclude that the defendant was prejudiced by his lack of knowledge of a portion of the victim's testimony prior to trial.

---

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

This court could not conclude from the record that the trial court clearly abused its broad discretion in determining that a proper foundation had been established to admit into evidence certain photographs depicting the victim's injuries that were affected by lighting distortions, as the portions affected by lighting distortions were identified and the jury was instructed to disregard them.

The trial judge did not abuse his discretion in denying the defendant's request to recuse himself from presiding over the case, the defendant having failed to meet his burden of establishing a factual basis that created a reasonable appearance of impropriety.

Argued February 5—officially released June 10, 2025

*Procedural History*

Substitute information charging the defendant with two counts of the crime of risk of injury to a child and one count of the crime of assault in the second degree, brought to the Superior Court in the judicial district of New Haven, geographical area number seven, where the court, *Chaplin, J.*, denied the defendant's motions for a bill of particulars; thereafter, the case was tried to the jury before *Chaplin, J.*; subsequently, the court, *Chaplin, J.*, denied the defendant's motions for a judgment of acquittal, judicial recusal and a mistrial; verdict and judgment of guilty of one count of risk of injury to a child, from which the defendant appealed to this court. *Appeal dismissed in part; affirmed.*

*Matthew D. Popilowski*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Nichol Peco*, senior assistant state's attorney, for the appellee (state).

*Opinion*

CRADLE, J. The defendant, Emmanuel C., appeals from the judgment of conviction, rendered following a jury trial, of one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant claims that (1) there was insufficient

evidence to support his conviction, (2) the trial court improperly denied his renewed motions for a bill of particulars, (3) the trial court improperly denied his motion for a mistrial based on his allegation that the state failed to disclose certain impeachment evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), (4) the trial court abused its discretion in admitting certain photographs into evidence, and (5) the trial court improperly denied his request for judicial recusal. We dismiss as moot the defendant's claim as to the denial of his renewed motions for a bill of particulars. With respect to the defendant's remaining claims, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On November 13, 2019, the defendant's twelve year old son (victim) got into an argument with his nine year old half sister, resulting in the victim being sent to his room by his stepmother. Shortly thereafter, the defendant arrived home and went to the victim's room. The defendant, who was angry and yelling at the victim for "being disrespectful," grabbed the victim by his shirt collar and "pinned" him against the wall. The defendant then "switched to the back" of the victim's shirt collar, lifted him off the ground, and "body slammed" the victim onto his bed, causing the victim to hit his head on the bed. At some point during the encounter, the defendant had the victim in a "chokehold." The force of the "body slam" caused one of the wooden planks underneath the mattress to break.

When the victim went to school the following day, his "head was hurting" and his eyes were bothered by the lights. The victim told a school social worker what had happened the night before. The disclosure was then relayed to the school nurse, the school resource officer, and a social worker from the Department of Children and Families (department). After being examined by

the school nurse and speaking with the school resource officer and department social worker, the victim was transported to the pediatric emergency department of Yale New Haven Hospital. After being examined by two doctors at the hospital, the victim was diagnosed with a concussion. The doctors also noted the presence of petechiae[1] on the victim's neck and torso as well as bruising on his forehead, cheeks, torso, back, chest, and legs. The doctors determined that the victim's injuries were "consistent with being body slammed and held in a chokehold . . . ." Shortly thereafter, police officers, in the course of their investigation, went to the defendant's house, where they observed a "repaired broken slat beneath [the victim's] bed."

The defendant was arrested pursuant to a warrant and subsequently charged in an amended long form information with one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (3) (count one) and two counts of risk of injury to a child in violation of § 53-21 (a) (1) (counts two and three). Following a jury trial over several days in August, 2023, the defendant was found guilty of risk of injury to a child under count two and not guilty as to the remaining counts.[2] On November 30, 2023, the court, *Chaplin, J.,* sentenced the defendant to five years of incarceration, execution suspended, followed by three years of probation. This appeal followed.

I

The defendant first claims that there was insufficient evidence to support his conviction.[3] We are not persuaded.

---

[1] "Petechiae are . . . small little dots on the skin . . . caused by . . . blood vessels that pop underneath the skin."

[2] With respect to count one, the jury also found the defendant not guilty on the lesser included offense of assault in the third degree in violation of General Statutes § 53a-61 (a) (2).

[3] For jurisprudential reasons, we address the sufficiency of the evidence claim first, although this differs from the order in which the claims were presented by the defendant in his brief to this court.

In count two of the amended long form information, the state charged the defendant with risk of injury to a child in violation of § 53-21 (a) (1), alleging that "the defendant did an act likely to impair the health of a child under the age of sixteen years . . . to wit: the defendant slammed [the victim] onto his bed, breaking the bed." At the close of the state's case-in-chief, the defendant filed a written motion for judgment of acquittal asserting, inter alia, that there was insufficient evidence to convict him of that offense. After hearing argument by both parties, the court denied the defendant's motion. On appeal, the defendant claims that there was insufficient evidence to support his conviction because, he argues, the act of slamming the victim onto the bed, and "[t]he breaking of one wooden slat under a mattress . . . where the defendant restrained the [victim] does not rise to the level of blatant physical abuse."

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In particular, before this court may overturn a jury verdict for insufficient evidence, it must conclude that no reasonable jury could arrive at the conclusion the jury did. . . . Although the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Charles L.*, 217 Conn. App. 380, 386, 288 A.3d 664, cert. denied, 346 Conn. 920, 291 A.3d 607 (2023).

Section 53-21 provides in relevant part: "(a) Any person who (1) wilfully or unlawfully . . . does any act likely to impair the health . . . of any [child under the age of sixteen years] . . . shall be guilty of . . . a class C felony . . . ." With respect to "acts likely to impair the health of children . . . our precedent provide[s] an authoritative judicial gloss that limits the type of physical harm prohibited by § 53-21 to instances of deliberate, blatant abuse. . . . [S]ee, e.g., *State* v. *McClary*, 207 Conn. 233, 234–39, 541 A.2d 96 (1988) (child suffered brain injury from violent shaking); *State* v. *Eason*, 192 Conn. 37, 38, 470 A.2d 688 (1984) (child beaten severely with belt), overruled in part on other grounds by *Paulsen* v. *Manson*, 203 Conn. 484, 525 A.2d 1315 (1987); *State* v. *Martin*, 189 Conn. 1, 6, 454 A.2d 256 (child pushed into wall and then to floor), cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983); *State* v. *Palozie*, 165 Conn. 288, 290–92, 334 A.2d 468 (1973) (child thrown against chair and head hit against floor)." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Ares*, 345 Conn. 290, 298, 284 A.3d 967 (2022). It is well established, however, that "the state need not prove actual injury . . . under . . . the act prong of § 53-21 (a) (1)." Id., 299. Rather, "[i]n order to secure a conviction under the act prong in the present case, the state was required to prove that the defendant had engaged in an act of deliberate, blatant abuse that was likely to [endanger the victim's] physical well-being."[4] (Internal quotation marks omitted.) Id., 302.

Here, the evidence indicated that the defendant lifted the victim off the ground by his shirt collar and, using

_____

[4] Our Supreme Court has defined "blatant" in this context to mean "obtrusive in an offensive manner . . . completely or crassly obvious"; (internal quotation marks omitted) *State* v. *Nathan J.*, 294 Conn. 243, 256, 982 A.2d 1067 (2009); while the term deliberate "merely requires that the abuse be intentional, conscious and wilful." Id., 257 n.10.

both hands, "body slammed" the victim onto his bed with enough force to break a wooden slat underneath the mattress. Moreover, the investigating officer, Detective Angelo Delieto, testified that the defendant himself acknowledged during a voluntary interview shortly after the incident that "he may have slammed [the victim] hard enough to give him a concussion . . . ."

At the time of the offense, the defendant was an adult male who was approximately seven inches taller and 100 to 120 pounds heavier than the twelve year old victim. During trial, the jury heard the testimony of the victim, who described the incident and how the defendant slammed him on the bed. The jury also heard the testimony of medical professionals who had treated the victim the following day describe the victim's injuries and testify that those injuries were consistent with the version of events described previously. Thus, the jury reasonably could have concluded that the defendant "body slammed" the victim onto the bed with such significant force that it caused the victim to sustain a concussion.

On the basis of the foregoing evidence and the inferences reasonably drawn therefrom, the jury reasonably could have found that the defendant engaged in an act of deliberate, blatant abuse that was likely to endanger the victim's physical well-being. Accordingly, we conclude that there was sufficient evidence to support his conviction.

II

The defendant next claims that the court erred in denying his renewed motions for a bill of particulars. We dismiss this claim as moot.

The following facts and procedural history are relevant to the defendant's claim. On February 2, 2021, the defendant filed a motion for a bill of particulars. The

motion was heard the following day, at which time defense counsel stated that a long form information from the state "should be acceptable" to satisfy the defendant's request for a bill of particulars. On February 9, 2021, the state filed a long form information (original information). In count two of the original information, the state charged the defendant with assault in the second degree in violation of § 53a-60 (a) (3), alleging that "the defendant recklessly caused serious physical injury to another person by means of a dangerous instrument . . . to wit: the defendant slammed [the victim] on his bed causing a concussion." In count four of the original information, the state charged the defendant with risk of injury to a child in violation of § 53-21 (a) (1), alleging that "the defendant did an act likely to impair the health of a child under the age of sixteen . . . to wit: the defendant slammed [the victim] onto his bed, breaking the bed."[5]

On February 1, 2023, the defendant filed a renewed motion for a bill of particulars, wherein he objected to the original information insofar as the state alleged that "the defendant slammed [the victim] on his bed causing a concussion." Because, he asserted, "a bed consists of multiple separate parts—including the frame and mattress, composed of different materials," the defendant requested that "the court order the state to identify that part of the bed that the defendant is alleged to have committed assault in the second degree with" in order to identify "the specific part . . . allegedly used as the dangerous instrument." On June 19, 2023, after the state failed to respond and the court took no action on the defendant's renewed motion, the defendant filed

---

[5] The original information charged the defendant with five counts. The defendant's claim only relates to count two and count four of the original information; thus, the remaining counts of the original information are not relevant to the defendant's claim on appeal.

a second renewed motion for a bill of particulars in order to call more attention to the first.[6]

Thereafter, on July 21, 2023, the state filed an amended long form information (operative information), removing counts one and three of the original information[7] so that count two, which charged the defendant with assault in the second degree, was now identified as count one, and count four, which charged the defendant with risk of injury to a child, was now identified as count two.[8] The state, however, made no changes to the allegations as set forth in its original information, and, accordingly, the operative information did not address the issue raised by the defendant's renewed motions.

On August 7, 2023, the court held a hearing to address, inter alia, the defendant's two renewed motions.[9] After

[6] The second renewed motion for a bill of particulars stated in relevant part: "The defendant . . . respectfully renews again his renewed motion for a bill of particulars dated January 31, 2023. The state has neither filed a renewed bill of particulars nor objected to the defendant's [January 31, 2023] motion since it was filed . . . ."

[7] See footnote 5 of this opinion.

[8] Accordingly, in count one of the operative information, the state charged the defendant with assault in the second degree in violation of § 53a-60 (a) (3), alleging that "the defendant recklessly caused serious physical injury to another person by means of a dangerous instrument . . . to wit: the defendant slammed [the victim] on his bed causing a concussion." In count two of the operative information, the state charged the defendant with risk of injury to a child in violation of § 53-21 (a) (1), alleging that "the defendant did an act likely to impair the health of a child under the age of sixteen years . . . to wit: the defendant slammed [the victim] onto his bed, breaking the bed."

Count five of the original information, charging the defendant with a second count of risk of injury to a child, became count three of the operative information. As stated herein, this charge is not relevant to the defendant's claims on appeal.

[9] The defendant indicated at the hearing that his original motion for a bill of particulars, dated February 2, 2021, was no longer pending because it had been resolved by the state's filing of the original information. The defendant further clarified that his second renewed motion was substantively identical to his first renewed motion, and, thus, a single ruling by the court would resolve both renewed motions.

hearing arguments from both parties, the court denied the defendant's renewed motions on the ground that "the evidence will bear out which aspect of the bed" was used, and, therefore, it was not necessary for the state to identify in the operative information the specific part of the bed that the defendant allegedly used.[10]

On appeal, the defendant claims that the court erred in denying his renewed motions for a bill of particulars. Specifically, the defendant argues that because counts one and two of the operative information both alleged that he used a "bed" to commit the respective offense, but did not specify which part of the bed, the court's denial of his renewed motions "allowed the state to be purposefully vague" and prevented him "from being sufficiently apprised of the offenses he was alleged to have committed [in order] to prepare his defense." Conversely, the state argues that the defendant's renewed motions pertained solely to count one of the operative information, for which the defendant was acquitted, and, therefore, his claim on appeal is moot.[11] We agree with the state.

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates this court's subject matter jurisdiction. . . . [A]n actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an

---

[10] The court reasoned: "[T]he bed is, as counsel noted, an item made up of several components. The components need not be specifically stated for the jury to draw the appropriate assumption or the appropriate facts and apply those facts to the law to make their determination based on the longform allegations. . . . [I]t will not be inconsistent for the jury to find that there was a bed utilized and the defendant slammed . . . the victim onto the bed, depending on which part. If it was on the mattress, still can be slammed on the bed. If it was on the headboard, still can be slammed on the bed. The footboard, still can be slammed on the bed."

[11] The defendant did not file a reply brief in this appeal, and his principal appellate brief did not address the issue of whether this claim is moot.

appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Citation omitted; internal quotation marks omitted.) *Wendy V.* v. *Santiago*, 319 Conn. 540, 544–45, 125 A.3d 983 (2015).

The defendant's contention that his renewed motions pertained to both counts one and two of the operative information is belied by the record. He specifically requested in his first renewed motion a court order requiring "the state to identify [the] part of the bed that the defendant is alleged to have *committed assault in the second degree with*" on the ground that "the state should be required to identify the specific part of the bed that was *allegedly used as the dangerous instrument*."[12] (Emphasis added.) In arguing his renewed motions before the trial court, the defendant further reiterated that he sought specification solely with respect to which part of the bed he allegedly used as a dangerous instrument.[13] With respect to count two of the operative information, charging the defendant with risk of injury to a child, the state was not required to prove, nor did it allege, that the defendant used the bed as a dangerous instrument in his commission of that offense. See General Statutes § 53-21 (a) (1). Conversely, with respect to count one, the state alleged, and was required to

[12] At the August 7, 2023 hearing on the defendant's renewed motions, defense counsel clarified that the second renewed motion raised the "[s]ame claim" as the first and affirmed that "the court's ruling on one would address both."

[13] Defense counsel argued: "The [victim] indicated that he was slammed on the bed, he hit his head on the mattress, and again, that is composed of multiple parts. So, the jury is going to be tasked with deciding whether or not the instrument used here is a dangerous instrument. . . . [I]t's not that the state hasn't provided any information in the long form, it's that it doesn't conform to what the evidence is going to be. . . . [I]t's a very specific incident here. The case law is clear, you know, anything can be a dangerous instrument. If the state is going to . . . identify the dangerous instrument in a long form, then it should be identified as to what it was."

prove, that the defendant "recklessly caused serious physical injury to [the victim] *by means of a dangerous instrument* . . . ." (Emphasis added.) See General Statutes § 53a-60 (a) (3). Accordingly, it is clear from the record before us that the defendant's renewed motions pertained solely to count one of the operative information. Because the defendant was acquitted on count one, we conclude that this claim is moot.

III

The defendant next claims that the court improperly denied his motion for a mistrial predicated on the state's alleged failure to disclose certain impeachment evidence in contravention of *Brady* v. *Maryland*, supra, 373 U.S. 87. We are not persuaded.

We begin with the standards of review governing the defendant's claim. "While the remedy of a mistrial is permitted under the rules of practice, it is not favored. . . . The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been denied the opportunity for a fair trial. . . . The trial court enjoys wide discretion in deciding whether a mistrial is warranted . . . . It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion." (Internal quotation marks omitted.) *State* v. *Rivera*, 152 Conn. App. 248, 254–55, 96 A.3d 1285, cert. denied, 314 Conn. 934, 102 A.3d 85 (2014).

"The applicable standard of review with respect to an alleged *Brady* violation is as follows. In *Brady* v. *Maryland*, supra, 373 U.S. 87, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith

or bad faith of the prosecution. . . . [T]he *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the suppressed evidence was favorable to the defense; and (3) that the evidence was material." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, supra, 152 Conn. App. 255–56. Thus, "[i]n order to obtain relief under *Brady*, a defendant bears the heavy burden of satisfying *all* three prongs of the aforementioned test . . . ." (Emphasis in original, internal quotation marks omitted.) *Stevenson* v. *Commissioner of Correction*, 165 Conn. App. 355, 368 n.3, 139 A.3d 718, cert. denied, 322 Conn. 903, 138 A.3d 933 (2016). "Whether the [defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) Id., 363.

The following facts and procedural history are necessary for our review of the defendant's claim. During the prosecutor's direct examination of the victim, the victim testified that when the defendant slammed him onto his bed, his head hit part of the bed frame.[14] The prosecutor then presented the victim with a pen and a photograph of his bed and asked him to circle where on the bed his head hit, upon which the victim circled the footboard of the bed.

---

[14] The victim was asked on cross-examination whether he had told the police that his head hit the mattress, and he indicated that he did not recall telling the police that. The victim was then asked what he had told the doctors at the hospital, and the victim indicated that he did not recall telling the doctors that his entire head hit the mattress but, rather, that he recalled telling them that part of his head hit the bed frame.

At the close of the state's case-in-chief, defense counsel orally moved for a mistrial on the basis that all "the information provided to [the defendant] leading up to trial" indicated that the victim's head hit the mattress, and the state failed to disclose that the victim would testify differently at trial. Defense counsel argued that the state's failure to disclose that information violated *Brady* because the information is "exculpatory . . . it's impeachment material. It's relevant to [the victim's] credibility; it's relevant to the testimony provided by the medical providers as to the mechanism of injury." In response to the court's inquiry as to what information supported the defendant's belief that the prosecutor knew prior to trial that the victim would testify that his head hit the footboard, defense counsel argued that "the [prosecutor] had [the victim] circle where he hit his head" on the photograph of the bed, and "we're taught in law school not to ask questions that we don't know the answer to."[15]

After a brief recess, the court issued a ruling from the bench denying the defendant's motion for a mistrial on the ground that the state's case was not "entirely dependent" on the victim's testimony that his head hit the footboard. The court also found that defense counsel had effectively impeached the credibility of the victim through his "comprehensive" and "skillful" cross-examinations of the victim and the state's witnesses.[16]

---

[15] In response, the prosecutor argued that the information about the victim's head hitting the footboard had been disclosed to the defendant because such information was necessarily included in the allegation that "his head . . . hit . . . the bed" because "the bed encompasses all parts of the bed."

[16] Specifically, the court stated: "[W]here impeachment evidence is at issue . . . typically, [a mistrial] arises [when] the [state's] case is entirely dependent upon the credibility of key witnesses. In this case we heard from the [victim]; however, we also heard from medical professionals. And the question of the elements of the crime of assault in the second degree do not rest entirely upon the testimony provided by the [victim] . . . . [H]is credibility is key to the case, but . . . the state's case is not entirely dependent upon [his] testimony [concerning the manner in which he was injured] in the sense that the testimony refers more so to the amount of force used

The court thus concluded that "the issue raised regarding the footboard versus the mattress . . . [was not] sufficient to rise to the level of [necessitating a mistrial]."

On appeal, the defendant argues that the fact "that the [victim] changed his story as to the mechanism of . . . injury" was material because, contrary to the trial court's conclusion, "the state's case hinged almost entirely on the credibility" of the victim. Accordingly, he asserts that the state's failure to disclose that information constituted a *Brady* violation, and, therefore, the court erred in denying his motion for a mistrial. Conversely, the state argues that the defendant's *Brady* claim fails because he has not demonstrated the first prong of *Brady*, that the alleged impeachment evidence was suppressed by the prosecutor. Although the trial court did not address this particular prong of *Brady* in its ruling on the defendant's motion for a mistrial, the state urges us to affirm the court's denial on this ground. We agree with the state. See *State* v. *Kinch*, 168 Conn. App. 62, 68 n.4, 144 A.3d 509 ("[i]t is well established that we may affirm the court's judgment on a dispositive [alternative] ground for which there is support in the trial court record" (internal quotation marks omitted)), cert. denied, 323 Conn. 930, 151 A.3d 383 (2016); see also *State* v. *John*, 210 Conn. 652, 679–80, 557 A.2d 93 (appellate court "is free to sustain a ruling on a different basis from that relied upon by the trial court"), cert.

in the act, rather than which specific portion of the bed was the basis for the injury itself. There was testimony here as well from medical professionals that [defense] counsel elicited . . . on the very issue at hand regarding the nature of [the victim's] injury; what would have been . . . the portion of . . . the bed that would have been likely or probable . . . to cause [the injury] . . . . So, in that respect, [defense] counsel . . . has effectively carried out . . . a comprehensive cross-examination on the issues including the specific manner in which the injury occurred; skillful cross-examination, if you will, to that very issue for impeaching . . . the credibility of the [victim] . . . ."

denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989), and cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

"In order to establish a violation of *Brady* . . . the defendant must demonstrate the *prosecution had possession* of [*Brady* material] that was not disclosed upon request." (Emphasis added; footnote omitted.) *State* v. *Falcone*, 191 Conn. 12, 17, 463 A.2d 558 (1983). "Materials not possessed by the [prosecution] cannot be suppressed within the meaning of *Brady*." (Internal quotation marks omitted.) *State* v. *Conn*, 234 Conn. 97, 118, 662 A.2d 68 (1995). On appeal, the defendant fails to identify any evidence, and our thorough examination of the record has not disclosed any, demonstrating that the prosecutor knew prior to trial that the victim would testify that his head hit the footboard rather than the mattress.[17] In arguing the defendant's motion for a mistrial before the trial court, defense counsel suggested that such knowledge was evidenced by the fact that the prosecutor had met with the victim prior to trial and, therefore, must have known how he would respond to her direct examination questions. Because the record does not support his assertion that the prosecution possessed prior knowledge of this testimony, his argument is speculative and, therefore, unavailing. This court has observed that, "[n]otwithstanding any pretrial indication or preview of testimony by a witness, there

---

[17] The defendant did not address this issue in his brief to this court. When asked during oral argument before this court whether there was any evidence in the record demonstrating that the alleged impeachment evidence was suppressed by the prosecutor, the defendant's counsel directed this court's attention to the prosecutor's statement before the trial court during argument on the defendant's motion for a mistrial that "[she] believe[d] that the evidence was disclosed" because "[the victim] indicated that his head . . . hit . . . the bed [which] encompasses all parts of the bed." See footnote 15 of this opinion. We disagree with the defendant that the prosecutor's statement demonstrates that she was aware prior to trial that the victim would testify specifically that his head hit the bed frame rather than the mattress.

is no guarantee or certainty of the testimony under oath on the witness stand. . . . [T]he unpredictable testimony of a witness . . . is one of the inherent risks of trial." (Internal quotation marks omitted.) *Chairamonte* v. *Manson*, 6 Conn. App. 476, 480–81, 506 A.2d 154, cert. denied, 200 Conn. 806, 512 A.2d 230 (1986). This is especially true where, as here, the witness was only sixteen years old at the time of trial and testifying about events that happened to him when he was twelve years old. Because the defendant has failed to point to persuasive evidence that demonstrates that the prosecutor had prior knowledge of how the victim would testify, we conclude that he has failed to establish that such information was suppressed by the prosecutor.

Moreover, even if we assume that the prosecutor knew prior to trial that the victim's testimony would differ from his previous statements, that information was elicited during the direct examination of the victim. "Evidence . . . that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*. . . . Under these circumstances, the defendant bears the burden of proving that he was prejudiced by the state's failure to make the information available to him at an earlier time. . . . The appropriate standard to be applied in a case such as this is whether the disclosure came so late as to prevent the defendant from receiving a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Reddick*, 197 Conn. 115, 121–22, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986).

On the basis of the record before us, we cannot conclude that the defendant was prejudiced by his lack of knowledge, prior to trial, that the victim would testify that his head hit the bed frame. To begin, the victim was the first witness to testify at trial, and the defendant was not prevented from utilizing the information elicited on direct examination in his cross-examination of

any witnesses, including the victim, or in the presentation of his defense. Indeed, the record demonstrates that defense counsel availed himself of the opportunity to cross-examine witnesses and, as noted by the trial court, did so "effectively" and "skillful[ly]."[18] The defendant claims that he was prejudiced because, had the victim's testimony regarding the mechanism of injury been disclosed earlier, it would have allowed his counsel "to utilize that information in more effectively cross-examining [the victim] and the [state's] other witnesses . . . [which] could have included retaining a medical expert to comment on the lack of [more severe injuries] . . . ." The defendant, however, fails to identify with any specificity how earlier disclosure of that information would have made his counsel's cross-examination of those witnesses more effective. The defendant likewise fails to explain why expert medical testimony was necessary to establish that the resulting injuries from being slammed into a wooden bed frame would have been more severe than an injury resulting from being slammed into a mattress. Defense counsel appeared to recognize in his closing argument, and we would agree, that the jurors were capable of making this inference themselves on the basis of their common sense and life experiences.[19] In addition, if the defendant, following the victim's disclosure on direct examination that his

---

[18] See footnote 16 of this opinion. Specifically, during defense counsel's cross-examination of the victim, counsel elicited testimony from the victim affirming that the victim had recalled telling the police and hospital personnel that his head hit the bed frame and denying that he had ever reported that his head hit only the mattress. In defense counsel's subsequent cross-examination of Delieto, the two doctors who examined the victim, and a hospital social worker, counsel elicited testimony that, when the incident occurred in 2019, the victim had told each witness that his head hit the mattress, not the footboard or any part of the bed frame.

[19] Specifically, defense counsel argued to the jury: "There's no cut to [the victim's] head; there's no fracture; there's no bruising on the brain . . . . [L]ook at [the picture of] the footboard, you tell me if that wooden footboard would not cause more damage . . . to a twelve year old's head."

head hit the footboard, believed that additional time was necessary to prepare for cross-examination of the state's witnesses or to consult a medical expert, he could have requested a continuance or, at the very least, asked for a recess following the direct examination of the victim. See, e.g., *State* v. *Reddick*, supra, 197 Conn. 122; *State* v. *Small*, 180 Conn. App. 674, 696–97, 184 A.3d 816, cert. denied, 328 Conn. 938, 184 A.3d 268 (2018). The defendant made no such request. Resultantly, the defendant's claims of prejudice are purely speculative and thus insufficient to satisfy his burden of proving that the timing of the disclosure prevented him from receiving a fair trial. See *State* v. *Walker*, 214 Conn. 122, 128, 571 A.2d 686 (1990).

Accordingly, we conclude that the defendant has failed to prove that the alleged impeachment evidence was suppressed by the prosecutor, as required to establish a *Brady* violation.[20] We therefore affirm the court's denial of his motion for a mistrial on this alternative ground.

## IV

The defendant next claims that the court abused its discretion in admitting three photographs that made the victim look "more injured than he actually alleged" due to lighting issues. Specifically, he claims that "the court ignored [the] complete lack of foundation for [their] admissi[on]." We disagree.

The state introduced into evidence three photographs of the victim's injuries through Seth Woolf, one of the

---

[20] In light of this conclusion, we need not address the defendant's claim on appeal that he met his burden with respect to the materiality prong of *Brady*. See *State* v. *Orr*, 199 Conn. App. 427, 453, 237 A.3d 15 (2020) ("[i]f . . . the [defendant] has failed to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred" (internal quotation marks omitted)).

emergency department physicians who treated the victim on November 14, 2019. With respect to the first photograph, Woolf testified that it was "a fair and accurate representation of [the victim's] anterior neck on November 14, 2019." Before the photograph was admitted into evidence, defense counsel sought and was granted permission to voir dire the witness, and the following colloquy occurred between defense counsel and Woolf:

"[Defense Counsel]: Looking at the top half of that picture, is that how [the victim's] face looked at that time or is that the . . . lighting in the photo?

"[The Witness]: I'm not sure I understand the question.

"[Defense Counsel]: Is there a claim based upon your examination that his whole face was bruised?

"[The Witness]: No, I think that is the lighting.

"[Defense Counsel]: Okay. So, then that is not a fair and accurate depiction of his face and neck?

"[The Witness]: The upper part."

Following that exchange, defense counsel objected on the basis that the state did not lay a proper foundation for the photograph's admission, arguing that the "entire picture . . . is not a fair and [accurate] depiction" of the victim's injuries. The court overruled defense counsel's objection, and the photograph was admitted as a full exhibit. In doing so, the court sua sponte "advise[d] the jury as to this photograph, that there is a portion of the photograph that has some lighting discrepancy but apart from that one portion, the rest of the photograph is a fair and accurate depiction [on] the date in question [of] the condition of the neck."[21]

[21] Although the defendant does not challenge on appeal the propriety of the court's sua sponte limiting instruction, we note that the court's instruction was incorrect insofar as it stated that "the rest of the photograph is a

Shortly thereafter, the state simultaneously introduced two additional photographs that depicted bruising on the victim's back, which Woolf testified to be "fair and accurate representation[s] of [the victim's] injuries on November 14, 2019." During voir dire by defense counsel, Woolf identified the areas of bruising on each photograph but acknowledged that lighting issues on both photographs appeared to create shadows on other areas of the victim's back, which potentially could be misinterpreted as additional bruising. Defense counsel objected to the admission of these photographs on the same ground as his objection to the first photograph, and the court again overruled counsel's objections and admitted the photographs. In doing so, however, the court instructed the prosecutor "to further clarify in the testimony as to what . . . injuries are depicted." The prosecutor subsequently had Woolf hold up each photograph and identify specifically which areas depicted bruising and which areas depicted shadows due to lighting issues.

"Photographic evidence is admissible if it has a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry. . . . Verification of a photograph is a preliminary question of fact to be determined by the trial court. . . . Whether a photograph shows a situation with sufficient accuracy to render it admissible, is a preliminary question for the court . . . . Further, the trial court has

fair and accurate depiction [on] the date in question [of] the condition of the neck." Section 1-3 (a) of the Connecticut Code of Evidence provides that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court." However, "[i]f the court determines that a prima facie showing of authenticity has been made, the evidence, if otherwise admissible, goes to the [jury] [and] [*i*]*t is for the [jury] ultimately to decide whether evidence submitted for its consideration is what the proponent claims it to be.*" (Emphasis added.) Conn. Code Evid. § 1-3 (b), commentary. In other words, it was ultimately a question for the jury in this case as to whether the photograph accurately and fairly depicted the condition of the victim's neck.

wide discretion in admitting photographic evidence and its determination will stand unless there has been a clear abuse of that discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Walker*, 215 Conn. 1, 6, 574 A.2d 188 (1990).

At the outset of Woolf's direct examination, he testified that when he examined the victim in the emergency department on November 14, 2019, the victim's injuries included bruising on his back and petechiae on his anterior neck. When Woolf subsequently was shown the three photographs at issue, Woolf testified that each photograph was a fair and accurate depiction of how the victim's injuries appeared on that date. Woolf's testimony thus provided a proper foundation for the admission of the photographs. See *State* v. *Swinton*, 268 Conn. 781, 802, 847 A.2d 921 (2004) ("[u]nder [the foundational] standard [for photographs], all that is required is that a photograph be introduced through a witness competent to verify it as a fair and accurate representation of what it depicts"). Although other portions of each photograph were affected by lighting distortions, those portions were identified and the jury was instructed to disregard them.[22] Although we recognize that the court could have directed the state to better sanitize the photographs so as to omit the areas affected by lighting distortions entirely, we cannot conclude from the record before us that the court clearly abused its broad discretion in determining that there was a proper foundation to admit the photographs into evidence.

---

[22] The court again advised the jury in its final instructions that it must disregard the distorted portions of each photograph: "Some . . . exhibits have been admitted for a limited purpose. When [the court] . . . ha[s] given a limiting instruction, you must follow it. For example, there are photographs admitted and [the court] told you to disregard the dark areas due to lighting issues."

V

Finally, the defendant claims that the court abused its discretion in denying his request for judicial recusal. Specifically, the defendant claims that recusal was warranted because, he argues, Judge Chaplin created an appearance of impropriety by allegedly engaging in an ex parte communication with the prosecutor. We disagree.

The following facts and procedural history are relevant to the defendant's claim. Prior to trial, the prosecutor had learned from a third party that the defendant previously worked as a judicial marshal but his employment had been terminated due to allegations of larceny. On August 10, 2023, the state presented the court with a subpoena, which was signed by Judge Chaplin on the same day, directing the Judicial Marshal Service to appear in court on August 14, 2023, and to bring with it "[a]ll employment records of [the defendant]."[23]

Thereafter, the defendant's employment records were filed with the clerk of the court, and, on August 21, 2023, the prosecutor orally moved to unseal them. In response, defense counsel acknowledged that "the state [had sent defense counsel] an email indicating [that it was] going to subpoena the records" and that he had obtained a copy of the subpoena after the records were delivered. Defense counsel, however, "object[ed] to the issuance of [the] subpoena." Specifically, he argued that the court's signing of the state's subpoena was improper because the subpoena had not been "contemporaneously [sent] to [him] . . . ." Defense counsel thus claimed that, because "[the subpoena] went to the court without coming to [him]," the court's signing of the subpoena was "essentially an ex

---

[23] The subpoena was served upon the Judicial Marshal Service on the same date that it was signed by the court.

parte communication" between the court and the prosecutor.

After noting defense counsel's concerns with the manner in which the subpoena was issued, the court "grant[ed] the request to unseal the [records] so that both sides can . . . review [them]" but reserved ruling on the issue of whether the records were admissible.[24] Defense counsel took exception to the court's ruling and further stated: "I would request that the court consider disqualifying itself given the process that was used to obtain these records. I do think it could raise the appearance of impropriety. There is . . . no way for me to say that the court acted inappropriately or could not ensure a fair trial for [the defendant], but I think the appearance is there." The court "appreciate[d] [him] raising that issue" but denied his request for recusal.

"A trial court's ruling on a motion for disqualification is reviewed for abuse of discretion. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . .

"Pursuant to our rules of practice; see Practice Book § 1-22; a judge should disqualify himself from acting in a matter if it is required by rule 2.11 of the Code of Judicial Conduct, which provides in relevant part that [a] judge shall disqualify himself . . . in any proceeding in which the judge's impartiality might reasonably be questioned . . . . In applying this rule, [t]he reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact,

---

[24] The following day, on August 22, 2023, the state filed a written motion to introduce the defendant's employment records as prior misconduct for impeachment purposes. The motion was heard before the court on the same date, and, after hearing arguments from counsel for both parties, the court denied the state's motion.

impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . . Moreover, it is well established that [e]ven in the absence of actual bias, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority. . . . Nevertheless, because the law presumes that duly elected or appointed judges, consistent with their oaths of office, will perform their duties impartially . . . the burden rests with the party urging disqualification to show that it is warranted." (Internal quotation marks omitted.) *Doe* v. *West Hartford*, 168 Conn. App. 354, 382, 147 A.3d 1083 (2016), aff'd, 328 Conn. 172, 177 A.3d 1128 (2018).

On appeal, the defendant argues that the court was "[w]orking ex parte with the state . . . to obtain potentially harmful evidence against the defendant," which, he asserts, "can only be viewed by a reasonable person as implicating the judge's impartiality." Although rule 2.9 of the Code of Judicial Conduct provides in relevant part that "[a] judge shall not initiate, permit, or consider ex parte communications or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter," the defendant's argument is unavailing because there is no evidence in the record that any improper ex parte communication occurred. Defense counsel acknowledged that the state notified him in advance that it "[was] going to subpoena" the defendant's employment records and that he subsequently received a copy of the subpoena. Defense counsel further acknowledged that he was aware that General Statutes § 31-128f required the state to obtain a court order

in order to subpoena those records.[25] Because our statutes and rules of practice expressly authorized the court to issue such an order in the underlying case, the state's presentation to the court of a subpoena and the court's signing of the state's subpoena was proper. See General Statutes § 54-2a (a) (in all criminal cases, Superior Court may issue "subpoenas for witnesses" and "all other criminal process"); see also Practice Book § 40-2 ("the judicial authority may, upon written request or upon its own motion, issue a subpoena . . . directing that . . . documents or objects [that are the subject of discovery orders] be delivered to the clerk of the court within a specified time"). Finally, the defendant concedes that the subpoena itself communicated no substantive information about the pending case,[26] and the record indicates that the court subsequently notified the defendant that the subpoena had been issued and did not unseal the subpoenaed records until both parties were afforded an opportunity to be heard on the matter.

Thus, from the record before us, the defendant clearly has not met his burden of establishing a factual basis

[25] General Statutes § 31-128f provides in relevant part: "No individually identifiable information contained in the personnel file . . . of any employee shall be disclosed by an employer to any person or entity not employed by or affiliated with the employer without the written authorization of such employee except . . . where the disclosure is made . . . (2) pursuant to a lawfully issued administrative summons or judicial order, including a . . . subpoena . . . ."

[26] In conceding this fact, defense counsel argued before the trial court and the defendant repeats in his brief to this court that the state's subpoena was merely "an unsupported request to obtain negative records for use at trial against the defendant," and, therefore, it was improper for the court to sign the subpoena where the state failed to provide "a proper foundation" for requesting the defendant's employment records. We are not persuaded. As stated herein, employment records are disclosable upon a lawfully issued judicial order, and the court, by signing the state's subpoena, properly issued such an order. Nothing in the controlling statutes or our rules of practice conditions the issuance of a subpoena for employment records upon any particular showing by the party requesting the records, and the defendant fails to provide any legal authority, nor could we locate any, that supports his contention otherwise.

that created a reasonable appearance of impropriety. Accordingly, we conclude the court did not abuse its discretion in denying the defendant's request for the trial judge to recuse himself from presiding over the case.

The portion of the appeal challenging the trial court's denial of the defendant's renewed motions for a bill of particulars is dismissed; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.